IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 20, 2019 Session

**BILLY ANGLIN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Williamson County**
**No. PCR599-159    James G. Martin III, Judge**

_____

**No. M2019-00083-CCA-R3-PC**

_____

The Petitioner, Billy Anglin, appeals from the Williamson County Circuit Court's denial of his petition for post-conviction relief from his convictions for first degree murder, attempted first degree murder, aggravated assault, and reckless endangerment, for which he is serving an effective sentence of life plus twenty-five years.  On appeal, the Petitioner contends that the post-conviction court erred in denying relief on his ineffective assistance of counsel and due process claims.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and JOHN EVERETT WILLIAMS, P.J., joined.

Vakessha Hood-Schneider (on appeal) and John Austin (at hearing), Franklin, Tennessee, for the Appellant, Billy Anglin.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Kim Helper, District Attorney General; for the appellee, State of Tennessee.

**OPINION**

**Conviction Proceedings**

According to the post-conviction court's review of the trial record during the post-conviction hearing, the Petitioner was charged with premeditated first degree murder of Bess Besson, attempted first degree murder of Buddy Simmons, aggravated assault of

Rose Haskins, and reckless endangerment of Rose Haskins, Tammy Gatlin, Tammy Carol, Junior Lee Haskins, and Boyce Cannon.[1]

The facts related to the Petitioner's convictions were summarized by this court in the Petitioner's previous appeal:

On August 23, 1991, Steve Anglin, accompanied by Billy Anglin and armed with his shotgun, had gotten out of his truck at Dottie's Trailer Park and made statements threatening Buddy Simmons and Linda Lee Anglin, who was married to Johnny Ray Anglin, a brother of the Appellants. He grabbed Mrs. Anglin by the hair, slapped her three or four times, called her a "slut" and threatened to kill her, telling her he was "fixing to blow [her] brains out." He also said "that son of a bitch in the yellow truck's going to get some too." The only yellow truck there belonged to Buddy Simmons.

Mrs. Anglin went into her trailer and called the police. Steve Anglin came into her trailer and said if she was calling the law, he would kill her. She stayed on the telephone until officers arrived, during which time Steve Anglin again threatened to kill her if she had him arrested.

Nonetheless, Mrs. Anglin went to get a warrant for Steve Anglin's arrest, but the sheriff would not allow her to have one issued. She returned to the trailer park to get her five-year-old son whom she had left with Bess Besson.

Neither Steve Anglin nor Billy Anglin were at the trailer park when she arrived. However, while she was at Ms. Besson's trailer, she heard the Anglins arrive. She heard loud music.

Steve Anglin and Billy Anglin were sitting close to one another on the back of a car with the radio in the car playing loudly. Steve Anglin was banging on a garbage can and screaming for someone to make him turn the radio down. There was a shotgun leaning between the men. Linda Anglin got very scared and went back to get a warrant for Steve Anglin's arrest.

---

[1] The Petitioner told the post-conviction court that the reckless endangerment count was amended before the case was submitted to the jury to allege Junior Lee Haskins as the sole victim.

-2-

As the Appellants sat on the car, Buddy Simmons was seen walking toward the car where the Appellants were sitting. Steve Anglin shot into the ground in front of Buddy and Buddy backed away, after which Steve shot into the ground again. Buddy stood still while Steve reloaded the gun, then Buddy grabbed the gun and swung it at Steve.

John Anglin, father of Steve and Billy Anglin, lived in the trailer park. Billy went to his father's trailer and said "Daddy, I need the gun." He got a shotgun. As he left the trailer, he put the gun to his shoulder and started swinging it and shooting. One shot hit Ms. Besson, who lived with Buddy Simmons. She had been outside trying to get Mr. Simmons to go back inside their trailer. At the time she was shot, she was returning to her trailer. She was not armed.

Rose Haskins was hit on the "rear end" by one of the shots. She was taken to the hospital. She recovered and testified at the trial.

Mr. Simmons was also hit by one of the shots fired by Billy Anglin and he fell. As Mr. Simmons laid on the ground, Billy Anglin then shot him again. Billy Anglin then went to Mr. Simmons, put the gun to his head and pulled the trigger. It clicked, apparently out of ammunition. Steve Anglin then pulled the shotgun back, put it to Mr. Simmons' head and pulled the trigger. Again, the gun clicked.

Steve Anglin then got down on the ground where Mr. Simmons was lying and was described by a witness as making motions with his hands like he was "carving something up." He then stood up and began kicking and "stomping" Mr. Simmons.

The medical proof revealed that Mr. Simmons had very large and numerous lacerations to his abdomen, chest, back, face, back of his head, ears, over his eyes, to his tongue, arms and legs, as well as a cut throat. The lacerations to his arms were so deep that his bones were visible to his elbows. Parts of his left thigh [were] blown away by the shotgun blast midway to his buttocks with much of the muscle and tissue in that area blown away. Both bones in his lower left leg were fractured, and his right ulna was fractured. He had an evulsion injury to his right hand and his fifth finger (pinky) was destroyed. Miraculously, Mr. Simmons recovered after extensive medical treatment requiring eleven separate surgeries and forty-nine days of hospitalization at Vanderbilt University Medical Center in Nashville.

-3-

During the shooting incident, Billy Anglin was heard to say to Mr. Simmons, "What are you going to do now, you son of a bitch?"

The autopsy revealed that Ms. Besson died of gunshot wounds to several vital organs including the left carotid artery, left subclavian artery and multiple left jugular veins. Three pieces of a deer slug were removed from her body. The slug entered her lower neck at the top of her sternum and exited in the area of the left shoulder blade. Ms. Besson was dead at the scene.

A TBI Crime Laboratory forensic expert tested the firearms found at the scene. A shotgun was identified as the weapon from which the fatal .410 gauge shell was fired. Other spent shotgun shells were identified as having been fired from the .12 gauge shotgun found at the scene. Both shotguns were surrendered to law enforcement officers by John Anglin, the father of Billy and Steve Anglin who had picked them up and taken them inside his mobile home. Four live .410 shotgun shells were found in Steve Anglin's left pants pocket.

Brenda Davis testified that immediately after the incident Billy Anglin appeared "calm and collected" and made small talk with her husband as he walked to his trailer, which was located behind Mr. and Mrs. Davis' trailer. Ms. Davis further testified that Steve Anglin "flipped us all a bird" as he was being driven away by the law enforcement officers.

*State v. Billy Anglin and Steve Anglin*, No. 01C01-9403-CC-00106, at *1-3 (Tenn. Crim. App. Aug. 25, 1998). This court affirmed the convictions. *See id.*

## Procedural Background

After this court filed its opinion, the Petitioner's trial counsel failed to file a timely application for permission to appeal with the Tennessee Supreme Court. After the time period expired, counsel filed a motion for extension of time to file an application for permission to appeal and lodged an application for permission to appeal with the supreme court. The motion was accompanied by an affidavit explaining the circumstances surrounding counsel's failure to file a timely application. The supreme court denied the motion for extension of time on November 6, 1998.

On May 21, 1999, the Petitioner filed a pro se petition for post-conviction relief. His first post-conviction counsel was appointed on July 16, 1999. The parties submitted an agreed order, which was adopted and filed by the post-conviction court on April 7, 2001. The order stated that the Petitioner "shall be permitted to file his Petition for

Appeal to [the] Tennessee Supreme Court" notwithstanding the expiration of the sixty-day period for filing. The order stated that the State waived any claim of prejudice and that all other issues raised in the post-conviction petition were dismissed. Notwithstanding the agreed order, no application for permission to appeal was filed with the supreme court.

In 2003, the Petitioner filed pro se pleadings attempting to ascertain the status and amend or reissue the order stating that he shall be permitted to file an application for permission to appeal to the supreme court.

The Petitioner's first post-conviction counsel was permitted to withdraw, and the second post-conviction counsel was appointed.[2] In 2005, the Petitioner's second post-conviction counsel was permitted to withdraw, and the third post-conviction counsel was appointed. The record does not contain evidence of any action on the case until April 2010, when the circuit court clerk notified the third post-conviction counsel that the case would be dismissed on June 30, 2010, unless counsel requested that the case remain open. On July 23, 2010, the post-conviction court dismissed the case for failure to prosecute.

In 2014, the Petitioner filed a pro se motion with the Tennessee Supreme Court, in which he requested the court grant him "pro se status for the purpose of filing his T.R.A.P. Rule 11." The Petitioner detailed his unsuccessful efforts to file an application for permission to appeal through counsel. The supreme court filed an order directing responses from the first post-conviction counsel and the State and, after those responses were filed, the court found that it did not have a complete record regarding the matter and remanded the case to the post-conviction court for an evidentiary hearing. The court directed:

> In addition to any other issues raised by the parties relative to the motion, the trial court should determine whether the trial court's order purporting to dismiss the post-conviction petition entered in July of 2010 was a nullity given the prior entry of the Agreed Order in April 2001, *see Anthony Perris v. State*, No. W2006-02236-CCA-R3-PC, 2008 WL 2483524 (Tenn. Crim. App. June 19, 2008), and whether [the Petitioner] should be permitted to file an amended post-conviction petition alleging that appellate counsel was ineffective for failing to file timely the application for permission to appeal after the entry of the Agreed Order.

---

[2] The motion to withdraw and order appointing new counsel are not in the record. An affidavit the first post-conviction counsel filed with the supreme court states that he was permitted to withdraw and that the second post-conviction counsel was appointed on May 28, 2004.

-5-

The supreme court also appointed counsel for the Petitioner.

On remand, the post-conviction court received briefs and conducted a hearing. In a written order filed August 14, 2015, the court concluded that the Petitioner had been denied due process in his efforts to pursue a delayed appeal of his convictions. The court determined that the July 23, 2010 order purporting to dismiss the case was void because the court had no jurisdiction to dismiss the case.[3] The court granted the Petitioner a delayed appeal of his convictions and ordered that the remaining post-conviction claims be stayed pending the outcome of the delayed appeal.

The Petitioner filed an application for permission to appeal from the Court of Criminal Appeals' opinion and the judgment affirming his convictions. The Tennessee Supreme Court denied his application on January 14, 2016.

Following the denial of the Petitioner's application for permission to appeal, his appointed counsel was permitted to withdraw, and a new attorney was appointed to assist the Petitioner in pursuing the post-conviction claims. Newly appointed post-conviction counsel filed an amended petition for post-conviction relief on November 1, 2016. The amended petition alleged that trial counsel had provided ineffective assistance because counsel failed to (1) obtain a severance of the Petitioner's case, (2) litigate adequately the question of the admissibility of expert testimony regarding the Petitioner's poor eyesight, (3) advise the Petitioner and allow him to testify at the trial, (4) present an adequate defense to the State's case, (5) object to hearsay evidence that Steve Anglin intended to kill Buddy Simmons and Linda Anglin, and (6) call Buddy Simmons to testify. The amended petition also alleged that the Petitioner's due process right to a speedy trial in the post-conviction case was violated by a delay of twenty-five years.

After the Petitioner filed complaints with the post-conviction court about his appointed counsel and after the court conducted a hearing, the court permitted counsel to withdraw and appointed a new attorney. The record reflects that this was the Petitioner's sixth post-conviction counsel.

The Petitioner's sixth post-conviction counsel filed an amended petition, which did not raise new issues but contained argument regarding the issues raised previously.

**Post-Conviction Hearing**

At the post-conviction hearing, which was held on November 16, 2017, the Petitioner testified that he had been represented by seven or eight attorneys but that he

---

[3] Although both orders were issued by the post-conviction court, different judges filed the July 23, 2010 and August 14, 2015 orders.

-6-

had very little communication with them. He said he had attorneys who were supposed to but failed to file appeals and attorneys from whom he did not hear for years.

The Petitioner testified that Steve Anglin, John Anglin, Buddy Simmons, and Robby Henson had died since his 1993 trial. The Petitioner identified Mr. Simmons as the victim of the shooting for which the Petitioner received a twenty-five-year sentence. The Petitioner said Mr. Henson "shot this girl with a pellet gun." The Petitioner said that John Anglin was his father and that Steve Anglin was the Petitioner's brother.

The Petitioner testified that he had lead counsel and co-counsel for his trial. He said he was tried in Hickman County, which resulted in a mistrial after the discovery that a court officer was related to one of the victims, Buddy Simmons. The Petitioner said he had been unconcerned about a court officer's relationship to Buddy Simmons because the Petitioner and the court officer were friends. The Petitioner said a change of venue occurred, which he opposed. The Petitioner agreed that he was tried jointly with his father and brother. The Petitioner said he wanted his case severed for trial but could not recall the reason his attorneys told him why the cases were not severed. The Petitioner said he had wanted his case severed because his brother had threatened to shoot people when the Petitioner was not present. The Petitioner said a joint trial "got me in the middle of it." Copies of two motions to sever were received as exhibits. The post-conviction court noted that, according to the Court of Criminal Appeals' opinion in the appeal of the convictions, the trial court had denied a motion to sever.

The Petitioner testified that his trial attorneys called Jerry Simmons, who was the Petitioner's first cousin, and "some doctor or something, Simon or something" to testify as defense witnesses. The Petitioner agreed he wanted to call his codefendants, his sister, "and a few other people there at the trailer park that night" as witnesses. He said he wanted his attorneys to call Buddy Simmons to testify about why Buddy Simmons "was over there coming in my area over there where I was at" and to explain "some stuff from years ago between me and him." The Petitioner said twenty to thirty people were present at the trailer park on the night of the crimes. He agreed that if Buddy Simmons had been called as a witness, the Petitioner would have wanted to portray Buddy Simmons as the aggressor. The Petitioner said that if his attorneys had called Boyce Cannon as a witness, he could have testified that he had been with Robby Henson two days before the offenses in this case, when Mr. Henson shot Rose Haskins "in the rear end with a pellet gun." He said showing that Mr. Henson shot Ms. Haskins would eliminate one victim from the crimes with which he was charged. The Petitioner said that his father died in 2003 and that his brother died in 2014. The Petitioner said the eyewitnesses would have testified that he did not hold a gun to Buddy Simmons's head. The Petitioner said that he had not put a gun to Buddy Simmons's head and that the Petitioner's brother had done so after the Petitioner told his brother the gun was out of ammunition.

The Petitioner testified that his trial attorneys should have done more to impeach Ms. Haskins, "Mary," and Ricky Stanley about changes between their preliminary hearing testimony and trial testimony. The Petitioner said his attorneys should have objected to the State's closing arguments that his self-defense theory was "ludicrous and [a] smoke screen," that a State's witness was credible, and that a defense witness lacked credibility. He said his attorneys should have objected, as well, to the State's posing a question "about all of the victims, bone blood and all of this old shotgun stuff which he didn't know nothing [sic] about." The Petitioner said his attorneys should have objected to the State's argument about how Buddy Simmons felt "while his flesh was being ripped away from his body." The Petitioner thought his attorneys should have objected to the State's argument that the Petitioner's saying "I put a gun to Buddy [Simmons]'s head in Jerry [Anglin]'s statement." The Petitioner claimed this allegation was not in Jerry Anglin's statement.

The Petitioner testified that his trial attorneys advised him not to testify at his trial due to his criminal record and that he did not testify. He said that he wanted to testify but that his attorneys said they "had it." He said his attorneys pursued a self-defense theory but not in the way he wanted and not to the extent he thought they should have. He agreed that he faced the death penalty and that his trial testimony could have been considered during the penalty phase if he had chosen to testify. He said he had four or five prior felony convictions, including convictions for burglary and receiving or concealing stolen property.

The Petitioner testified that he was examined before the trial by Dr. Robert Simon, an optometric physician, and that he was unsure whether Dr. Simon diagnosed him with myopia. He recalled that Dr. Simon said his eyesight was bad. He thought Dr. Simon testified at the trial but said the scope of Dr. Simon's testimony was limited by the trial court. The Petitioner thought Dr. Simon testified about the lighting conditions at the trailer park. When asked if the trial court had not allowed Dr. Simon to testify about the Petitioner's eyesight, the Petitioner said Dr. Simon had examined him after the offenses but before the trial.

The Petitioner testified that the trial judge should have recused himself. The Petitioner thought the trial judge had animosity about the Petitioner's brother, Steve Anglin, who had previously "won" a case in which the judge had been a witness. The Petitioner said the trial judge had already made up his mind about the Petitioner's case and had excluded evidence that was favorable to the defense. The Petitioner said the judge commented early in the case that he knew who the initial aggressor had been. The Petitioner said one of the prosecutors later became a judge and dismissed his post-conviction case.

Regarding delays, the Petitioner testified that he waited two years for a trial. He said one of his attorneys failed to file an application for permission to appeal, which necessitated his filing a post-conviction petition. He said he had an attorney who did not file anything for three to four years, another attorney who did not file anything for a year, and another who did not file anything for five years. He said that more recently, he had an attorney who withdrew after fifteen months because the attorney did not want to raise issues that the Petitioner wanted to raise. He said this attorney wrote to him but did not speak to him in person. The Petitioner said he had tried unsuccessfully for over twenty years to obtain the trial transcripts. Post-conviction counsel informed the court that he had tried unsuccessfully to obtain the sentencing hearing transcript for the Petitioner.

The transcript of a deposition of George Michael "Buddy" Simmons taken in a civil case against the Petitioner was received as an exhibit. The transcript reflects that Mr. Simmons testified in the deposition that he was shot during an altercation with the Petitioner and the Petitioner's brother. Mr. Simmons said that he did not know how many people shot at him and that shots came from different directions. Mr. Simmons said he did not go to the ground when shots hit him and had gone forty to fifty feet toward the source of the shots because he knew he would be shot in the back if he retreated. He said that he grabbed a gun from the Petitioner, who was reloading it, and that the Petitioner's brother got the gun and broke Mr. Simmons's shoulder and leg. Mr. Simmons said that "he" jumped on Mr. Simmons's back and that the Petitioner put a gun between Mr. Simmons's eyes and said, "[H]ow does it feel to know you're fixing to die, you SOB." Mr. Simmons stated that the Petitioner might as well shoot him because Mr. Simmons was "might near gone anyway." Mr. Simmons said that the Petitioner "snapped" the gun, which did not fire, and that the Petitioner's brother cut Mr. Simmons's throat, tongue, and the area over his eyes.

When asked at the post-conviction hearing how he theorized that Mr. Simmons would have been a favorable defense witness in light of the deposition testimony, the Petitioner questioned whether Mr. Simmons had said the Petitioner had put a gun to Mr. Simmons's head and had done anything other than shoot Mr. Simmons below the waist. The Petitioner said he had not told Mr. Simmons that Mr. Simmons was going to die and that he had said, "[W]hat [are] you going to do now you son of a b----," when the Petitioner came outside. The Petitioner said Mr. Simmons held a gun and needed only to drop it.

Trial counsel testified that both he and co-counsel were qualified to represent capital defendants and that the Petitioner faced the death penalty. Counsel said he met with the Petitioner at least ten to fifteen times in the two years before the trial.

Trial counsel testified that before the first trial ended in a mistrial, he noticed that one of the court officers directed comments toward one of the jurors. Counsel said that

he learned Buddy Simmons and the court officer were related and that the trial court granted counsel's motion for a mistrial on this basis. Counsel said the venue was changed from Hickman County to Williamson County for the second trial. Counsel said he explained to the Petitioner that counsel thought a change of venue would be beneficial because no one would know about the details of the case. Counsel noted that the Petitioner had a "stormy past" and had been involved in a United States Supreme Court case regarding the right to counsel for juveniles. Counsel said that the Petitioner was known around Hickman County and that the trailer park where the crimes occurred had a reputation for altercations and police response. Counsel said police officers told him that they had problems with the Petitioner's brother and that the Petitioner's family was "clannish," protected their own, and had their own rules at the trailer park. Counsel said these factors were among the things he considered in deciding to request a change of venue.

Trial counsel testified that another attorney in the case filed a motion for a severance and that he and co-counsel decided to "piggy back" the motion. He said this motion was filed before the first trial and that it was denied. Counsel said the Petitioner had no benefit from a joint trial. Counsel did not recall the circumstances surrounding an agreed order for a joint trial. He later recalled that the attorneys thought it best to proceed with the trial and did not think the trial court would have granted a severance. He said that, as things developed in the first trial, it became apparent that the Petitioner might not be given "a fair shot." Counsel agreed the trial court stated it might reconsider the motion for a severance if the Petitioner chose to testify.

Trial counsel testified that the defense theory was that the shooting had been an accident or mistake when the Petitioner had come to the aid of his brother. Counsel said their theory was that the Petitioner had heard yelling and gone outside with a gun but had tripped off the porch, which caused the gun to fire accidentally.

Trial counsel testified that the Petitioner expressed a desire to testify. Counsel said he was concerned the Petitioner might say something that would cause the jury to impose the death penalty. Counsel said he explained his concern to the Petitioner. Counsel said that the Petitioner made the decision not to testify in consultation with counsel and co-counsel and that the Petitioner agreed with their advice that he should not testify.

Trial counsel testified that although he could not recall an issue regarding Steve Anglin's statement of intent to kill Buddy Simmons, he believed such a statement would have been admissible as a hearsay exception.

Trial counsel testified that he and his investigator talked to Buddy Simmons before the trial. Counsel said that the investigator did the first round of interviews of the

witnesses and that written summaries of their statements were provided to the Petitioner. Counsel said he later interviewed the State's witnesses and other important witnesses and tried to determine "where the mistakes were being made by the witnesses." He said questions existed as to whether any of them remembered accurately what had happened. He said that he and co-counsel used the written summaries of the witnesses' prior statements when cross-examining the witnesses and that they were prepared for fourteen potential witnesses. Counsel thought they had been able to neutralize some of the State's proof through cross-examination. He said a female witness testified that she thought "it was just an accident." Counsel said that although the Petitioner thought some of the State's witnesses might provide testimony that was favorable to the defense, this was not the case after two rounds of witness interviews.

Trial counsel testified that he took the position that Mr. Simmons had been the aggressor. Counsel said he did not call Mr. Simmons as a defense witness because Mr. Simmons would not have been helpful. Counsel said Mr. Simmons did not like the Petitioner and, in counsel's opinion, the Petitioner's best interests were not served by calling Mr. Simmons as a defense witness. Counsel said that if Mr. Simmons had been called as a defense witness and had testified consistently with his testimony in the civil deposition, the jury might have been more inclined to impose the death penalty. Counsel said that "the victim" was related to a Centerville police officer and that he thought the State pursued the death penalty because a police officer's "brother, uncle, or cousin" had been injured.

Trial counsel testified that after the trial began, he became aware he needed to convey to the jury the lighting conditions at the trailer park. He said he obtained the trial court's approval for Dr. Simon to serve as a defense expert. Counsel said Dr. Simon used instruments which tested the amount of light at the scene. Counsel said he did not anticipate any issues with the admissibility of Dr. Simon's testimony because the court had appointed Dr. Simon as an expert. Counsel said the court permitted Dr. Simon's testimony regarding the lighting conditions. Counsel said, however, the court would not allow Dr. Simon to testify about the Petitioner's vision two years after the offenses because of the possibility of changes over time.

Trial counsel testified that he made a tactical decision not to ask the trial judge to recuse himself. Counsel said he had known the judge for years and had confidence in him as an astute judge. Counsel said that if the judge made a statement on the record about knowing who the aggressor in the incident had been, counsel would have objected.

Trial counsel acknowledged that he had filed the Petitioner's application for permission to appeal to the Tennessee Supreme Court late.

-11-

After receiving the proof and briefs from the parties, the post-conviction court filed an order denying relief. This appeal followed.

**Analyisis**

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

**I**

**INEFFECTIVE ASSISTANCE OF COUNSEL**

The Petitioner contends that he received ineffective assistance of counsel in several respects. To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn.

-12-

2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

As a preliminary matter, we address the State's argument that the Petitioner has waived this court's consideration of the ineffective assistance of counsel issues by failing make an adequate argument. Tennessee Rule of Appellate Procedure 27(a)(7)(A) states that an appellant's brief shall contain an argument which establishes the appellant's contentions, a statement of why the contentions require relief, citations to legal authorities, and references to the record. Issues which are not supported by sufficient argument are waived. Tenn. Ct. Crim. App. R. 10(b). Adjudication of appellate issues is frustrated, and often foreclosed, by inadequate argument. Despite the paucity of the Petitioner's arguments, we elect to address the issues in the present case, to the extent we are able to discern from the record the bases upon which the issues are raised.

A.    **Advising the Petitioner Not to Testify**

The Petitioner contends that his trial attorneys provided ineffective assistance of counsel in advising him not to testify. He argues that he would have testified that he could not see what he was shooting on the night of the crimes. He also argues that, by testifying, he would have obtained a severance, which we will address in subsection B below.

The post-conviction court found that the Petitioner and his trial attorneys discussed the Petitioner's right to testify, that the Petitioner wanted to testify, that his attorneys advised against it because of the risk of the Petitioner's saying something that might make the jury more inclined to recommend a death sentence, and that the Petitioner elected to follow his attorneys' advice about not testifying. The post-conviction court found that the Petitioner failed to show that his attorneys performed deficiently in advising him not to testify.

On review, the record supports the post-conviction court's determination. The Petitioner was advised of his right to testify and elected to follow his trial attorneys' advice. His attorneys' advice that he not testify was based upon their concerns about his testimony adversely affecting the jury and making the possibility of a death sentence more likely. We note, as well, that the Petitioner did not testify at the post-conviction hearing about the facts to which he would have testified if he had elected to take the stand at his trial. Although post-conviction counsel argues that the Petitioner would have testified that he was unable to see what he shot on the night of the crimes, the transcript

of the post-conviction hearing does not contain the specifics about which the Petitioner claims he would have testified. The Petitioner merely testified generally at the hearing that he thought they were relying on a self-defense theory and that he "wanted to get up there and tell [his] story." To the extent that the Petitioner addressed any question about whether he had poor eyesight, his post-conviction testimony centers on the trial court's ruling regarding the admissibility of Dr. Simon's prospective testimony about the Petitioner's eyesight. Without knowing how the Petitioner might have testified, the post-conviction court had no basis from which it might conclude that he suffered prejudice from following his attorneys' advice not to testify. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.") In addition, the Petitioner's post-conviction testimony that he wanted to tell his story in furtherance of a self-defense theory is not consistent with his argument on appeal that his eyesight was so poor he could not have seen where he shot. The post-conviction court did not err in denying relief on this basis.

**B.    Change of Venue**

The Petitioner contends that his trial attorneys were ineffective relative to the change of venue. The Petitioner argues in his brief that a Hickman County jury would have been more sympathetic to him than was the Williamson County jury. The Petitioner has not identified any factual or legal basis for this assertion.

The Petitioner testified at the post-conviction hearing that he opposed the change of venue, which occurred after the first trial ended in a mistrial. Trial counsel testified that a Hickman County court officer and one of the victims were friends, that a police officer and one of the victims were related, and that the Petitioner and his brother had a bad reputation in the community. In counsel's opinion, the Petitioner had a better change of receiving a fair trial in Williamson County. The post-conviction court found that counsel made an informed, tactical decision to agree to a change of venue. Thus, the post-conviction court concluded that the Petitioner was not entitled to relief.

On review, the record supports the post-conviction court's determination. After a mistrial occurred due to a friendship between a court officer and a juror and after consideration of several factors which trial counsel thought might affect the likelihood of the Petitioner's receiving a fair trial in Hickman County, counsel consented to a change of venue to Williamson County. The record supports the court's determination, and the court did not err in denying relief on this basis.

## C.     **Failure to Object to the State's Evidence**

The Petitioner contends that his trial attorneys provided ineffective assistance because they did not object to hearsay evidence of Steve Anglin's stated intent to kill Buddy Simmons and Linda Anglin. The post-conviction court concluded that Steve Anglin's statement was admissible as a hearsay exception for an admission of a party opponent. Therefore, the Petitioner's trial attorneys had not provided ineffective assistance.

Tennessee Rule of Evidence 803(1.2)(E) provides a hearsay exception for "[a] statement offered against a party that is . . . a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy." The Petitioner has not identified a reason why the post-conviction court erred in concluding that the evidence fell under this hearsay exception, and we decline to speculate as to the Petitioner's unstated reasoning. We conclude that the post-conviction court did not err in determining that the Petitioner failed to prove his ineffective assistance of counsel claim and that the court properly denied relief on this basis.

## D.     **Failure to Call Buddy Simmons as a Defense Witness**

The Petitioner contends that his trial attorneys were ineffective because they failed to call Buddy Simmons as a defense witness. He argues that Mr. Simmons, who was deceased by the time of the post-conviction hearing, would have testified that he had an issue with Steve Anglin, not the Petitioner. The post-conviction court found that Mr. Simmons had provided deposition testimony which was unfavorable to the Petitioner in a related civil case, that trial counsel's investigation showed Mr. Simmons did not like the Petitioner, and that the Petitioner's trial attorneys made a strategic decision not to call Mr. Simmons because they thought his testimony "might have heightened the jury's awareness to the death penalty." Thus, the court concluded that the Petitioner had failed to show his attorneys performed deficiently, and it denied his ineffective assistance of counsel claim as to this issue.

Although the Petitioner claimed at the post-conviction hearing that Steve Anglin, not the Petitioner, put a gun to Mr. Simmons's head, Mr. Simmons testified in the civil deposition that the Petitioner held the gun to Mr. Simmons's head and asked Mr. Simmons how it felt to know he was about to die. Trial counsel testified at the post-conviction hearing that he made the decision not to call Mr. Simmons because his investigation showed that Mr. Simmons would not be a favorable witness and might cause the jury to be more inclined to recommend a death sentence. The record supports the post-conviction court's determination that the Petitioner failed to show that his attorneys performed deficiently. In view of the evidence regarding Mr. Simmons's potential damaging testimony as a defense witness at the Petitioner's trial, the Petitioner

has failed to show how he was prejudiced, as well.  The post-conviction court did not err in concluding that the Petitioner failed to prove his ineffective assistance of counsel claim and in denying relief on this basis.

### E.      Failure to Call Boyce Cannon as a Defense Witness

The Petitioner contends that his trial attorneys were ineffective because they did not call Boyce Cannon to testify as a defense witness.  He claims Mr. Cannon would have testified that Ms. Haskins had been shot a few days before the crimes, rather than during the incident.  The post-conviction court found that even if Mr. Cannon had testified for the defense, the Petitioner had not shown that his convictions for the offenses related to victims other than Ms. Haskins would have been affected.  Thus, the court concluded that the Petitioner had not shown that his attorneys performed deficiently or that he had been prejudiced by their performance, and it denied relief on this basis.

The record reflects that Mr. Haskins did not testify at the post-conviction hearing and that the only evidence of how he might testify came from the Petitioner, who claimed Mr. Haskins would have testified that Robby Henson, who was deceased by the time of the post-conviction hearing, shot Rose Haskins "in the rear end with a pellet gun."  As we have stated, a petitioner who claims his attorneys should have presented a defense witness at trial should call the witness to testify at the post-conviction hearing.  *See Black*, 794 S.W.2d at 757.  Because the Petitioner failed to present evidence to support his claim by calling Mr. Henson as a post-conviction witness, the post-conviction court did not err in denying relief on this basis.

### F.      Failure to Object to Improper Statements During Closing Arguments

The Petitioner contends that his trial attorneys provided ineffective assistance of counsel because they did not object to "improper statements" made during the State's closing arguments.  The Petitioner's brief does not identify the alleged improper statements to which he claims his attorneys should have objected, nor does it contain any legal support for a conclusion that such statements were objectionable.  At the post-conviction hearing, the Petitioner testified that his attorneys did not object to argument that his self-defense theory was "ludicrous" and a "smoke screen," that a defense witness was incredible, that the victims were "bone blood and all of this old shotgun stuff," that the prosecutor wondered how Buddy Simmons felt while "his flesh was being ripped away from his body," that the prosecutor believed the testimony of a State's witness, and that Jerry Anglin's statement said the Petitioner put a gun to Mr. Simmons's head when the statement did not say this.

Relative to the claims related to the State's attack on the self-defense theory and to the State's characterization of the defense theory as "ludicrous" and a "smoke screen,"

the post-conviction court found that the Court of Criminal Appeals had denied relief in the appeal of the convictions.[4] As to the remaining allegations of ineffective assistance related to failure to object to closing arguments, the post-conviction court noted that these issues had not been raised in the petition or amended petitions and that the Petitioner had not provided the post-conviction court with a trial transcript of the closing arguments. The post-conviction court concluded that the Petitioner had not met his burden of showing how "these comments denied him a right to a fair trial."

The post-conviction court correctly noted that the petition and amended petition do not contain an allegation of ineffective assistance of counsel for failing to object to the closing arguments. The original petition alleged (1) trial court error in failing to admonish the State for unspecified, allegedly improper closing arguments and (2) prosecutorial misconduct for unspecified, alleged improper closing arguments. Neither of these allegations cast the issue as one of the ineffective assistance of counsel. The post-conviction court did not address these allegations in terms of whether the Petitioner had received the ineffective assistance of counsel, which is how the issue is raised on appeal. The post-conviction court cannot be faulted for not addressing the issue as a question of whether the Petitioner was deprived of the effective assistance of counsel when the Petitioner had failed to raise the issue in his petitions.

As a general proposition, this court will not address issues that were not raised in the post-conviction petition or addressed by the post-conviction court. *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1991); *see State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) (stating that issues raised for the first time on appeal are waived). Because the Petitioner failed to raise an ineffective assistance of trial counsel allegation related to his attorneys' failure to object to specific portions of the State's closing arguments, thereby depriving the post-conviction court of the opportunity to adjudicate this claim, we conclude that our consideration of the issue, at this juncture, is waived. The Petitioner is not entitled to relief on this basis.

## II

## DENIAL OF DUE PROCESS

The Petitioner contends that he was denied due process by the lengthy delay between the filing of his post-conviction petition in 1999 and the 2017 hearing. He

---

[4] Relative to an issue raised in the previous appeal regarding the State's criticism during closing arguments of the self-defense theory in view of the number of shots fired, this court noted that the Petitioner's trial counsel had objected and that the trial court had sustained the objection. Relative to the State's characterization of the defense theory as "ludicrous" and a "smoke screen," this court noted that the defense had not objected to the argument and "cannot be heard to complain" in the absence of an objection, but the court nevertheless reviewed the statements in context and determined that no error existed. *See Billy Anglin*, 1998 WL 531847, at *5-6.

argues that he did not have a fair hearing because memories had faded and witnesses had died. The State counters that no due process violation occurred and notes that any delay cannot be attributed to the State.

The post-conviction court found that the Petitioner had been denied due process because of the delay between the filing of his post-conviction petition and his receiving a delayed appeal of his conviction proceedings in the form of an application for permission to appeal to the Tennessee Supreme Court. The post-conviction court found, however, that the Petitioner had received relief in the form of the delayed appeal and that the supreme court had acted on his application by denying permission to appeal. Thus, the post-conviction court concluded that the Petitioner had been afforded a remedy for the due process violation. The court also found that to the extent the Petitioner claimed he had been abandoned by his post-conviction counsel, he had no constitutional or statutory right to the effective assistance of counsel in a post-conviction proceeding, pursuant to *House v. State*, 911 S.W.2d 705, 712 (Tenn. 1995).

In the post-conviction realm, due process requires merely that the petitioner have "'the opportunity to be heard at a meaningful time and in a meaningful manner.'" *House*, 911 S.W.2d at 711 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)); *see Stokes v. State*, 146 S.W.3d 56, 61 (Tenn. 2004). Although the delay in this case was significant, the record reflects inaction on the part of the Petitioner and his attorneys for years at a time. In any event, the Petitioner was afforded a hearing, at which he was allowed to testify at length as to his alleged grievances. The post-conviction court filed a lengthy, detailed order addressing all of the issues raised. Ultimately, the court found that the Petitioner failed to prove his claims on the merits. The court properly determined that the Petitioner was not entitled to relief on his due process claim related to the post-conviction claims other than the delayed appeal.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE